# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERTA ANN K.W. WONG LEUNG REVOCABLE TRUST U/A DATED 03/09/2018, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-1251-BWD |
| AMAZON.COM, INC., | ) ) ) | |
| Defendant. | ) | |

## POST-TRIAL FINAL REPORT

Final Report:  May 1, 2024
Date Submitted:  April 26, 2024

Samuel L. Closic and Seth T. Ford, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; OF COUNSEL: Brian J. Robbins, Stephen J. Oddo, Gregory E. Del Gaizo, Michael J. Nicoud, and Eric M. Carrino, of ROBBINS LLP, San Diego, California; Daniel B. Rehns and Scott Jacobsen, of HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York, *Attorneys for Plaintiff Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018*.

Garrett B. Moritz, Dylan T. Mockensturm, and Benjamin M. Whitney, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: William Savitt, Anitha Reddy, Adam M. Gogolak, and Alexis J. Abboud, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Defendant Amazon.com, Inc.*

**DAVID, M.**

In this Section 220 proceeding, a stockholder of Amazon.com, Inc. ("Amazon" or the "Company") seeks books and records to investigate possible corporate mismanagement, wrongdoing, and waste, citing concerns that Amazon fiduciaries have authorized or allowed the Company to engage in anticompetitive practices in violation of antitrust laws. As the basis for its demand, the stockholder identifies "government investigations, lawsuits, fines, media coverage, and other lawsuits."[1] Amazon initially agreed to produce "a targeted set of materials" in response to the demand, but the parties could not agree on a confidentiality order, and this action followed.

This post-trial final report concludes that the stockholder plaintiff has failed to present sufficient evidence to suggest a credible basis from which the Court can infer possible wrongdoing. Because the demand does not state a proper purpose for inspection, this report recommends that the Court enter judgment for Amazon.

## I.     BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pre-trial order, 128 joint trial exhibits, and argument presented at a one-day paper trial held on April 26, 2024.[2]

---

[1] Pl.'s Op. Pre-Trial Br. [hereinafter, "POB"] at 31, Dkt. 40.

[2] The Pre-Trial Stipulation and Order is cited as "PTO ¶ __". Joint exhibits, which are numbered 1 through 114 and 214 through 227, are cited as "JX __".

**A.** **Amazon Becomes The Subject Of Government Investigations Concerning Antitrust Compliance.**

Amazon is a Delaware corporation with its principal executive offices in Seattle, Washington.[3] Amazon earns revenue primarily by selling a wide range of goods and services, from retail products sold to consumers through online and physical stores to cloud computing services sold to technology users such as businesses, governments, and educational institutions.[4] In 2023, Amazon's revenues were roughly $575 billion.[5]

Over the years, Amazon "has been a frequent focus of news articles and advocacy group pieces highlighting its market power."[6] It also has been the subject of government investigations. For example, in June 2019, the Subcommittee on Antitrust, Commercial and Administrative Law of the Judiciary Committee of the United States House of Representatives (the "Congressional Subcommittee") announced an "investigation into competition in digital markets" and the conduct of "dominant firms," including Amazon.[7]

---

[3] PTO ¶ 1.

[4] JX 81 at 20, 42-44.

[5] *Id*. at 24.

[6] *Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc*., 2022 WL 1760618, at *2 (Del. Ch. June 1, 2022).

[7] JX 216 at 1.

In July 2019, the European Commission, the executive body of the European Union, announced that it was investigating "whether Amazon's use of sensitive data from independent retailers who sell on its marketplace [wa]s in breach of EU competition rules."[8] The investigation concerned "agreements between Amazon and its marketplace sellers" and how Amazon uses data to select which retailers can sell products through the "Buy Box" on its site.[9]

Also in July 2019, the Department of Justice ("DOJ") announced that it was "reviewing whether and how market-leading online platforms have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."[10] Around the same time, news articles reported that the Federal Trade Commission ("FTC") was investigating whether major technology companies, including Amazon, had violated antitrust laws.[11]

In April 2020, the Wall Street Journal published an article reporting that "Amazon.com Inc. employees have used data about independent sellers on the company's platform to develop competing products, a practice at odds with the

---

[8] JX 2 at 1; JX 3 at 1.

[9] JX 8 at 3.

[10] *Amazon.com, Inc.*, 2022 WL 1760618, at *2.

[11] JX 4-6; JX 9-12.

company's stated policies."[12]  After that article was published, a U.S. Senator called for a "criminal antitrust investigation of Amazon,"[13] and Amazon's founder and former CEO, Jeff Bezos, was asked to testify before the Congressional Subcommittee.[14]  Bezos testified before the Congressional Subcommittee on July 29, 2020.[15]  Three months later, in October 2020, the Congressional Subcommittee completed its investigation and issued a report that made policy recommendations but did not find that Amazon had violated any antitrust laws.[16]

In December 2021, Italy's antitrust regulator, the Italian Competition Authority (the "ICA"), issued a decision against Amazon subsidiaries Amazon Services Europe S.à r.l., Amazon Europe Core S.à r.l., Amazon EU S.à r.l., Amazon Italia Services S.r.l., and Amazon Italia Logistica S.r.l., finding that certain "marketplace and logistics practices in Italy infringe[d] EU competition rules."[17]  "The decision impose[d] remedial actions and a fine of €1.13 billion" (the "ICA

[12] JX 5 at 1.

[13] *Amazon.com, Inc.*, 2022 WL 1760618, at *2.

[14] JX 6 at 2; JX 7 at 4; JX 217 at 3.

[15] JX 11 at 2.

[16] JX 13 at 376-405.

[17] JX 24 at 4.

Fine").[18]  Amazon appealed that decision.[19]  On April 29, 2023, Amazon reported that it had paid the ICA Fine but would seek to recover it pending conclusion of all appeals.[20]

In April 2022, the Wall Street Journal reported that the Securities and Exchange Commission "[wa]s probing how [Amazon] . . . handled disclosures of its employees' use of data from sellers on its e-commerce platform."[21]

## B.  A Stockholder Seeking To Investigate Amazon's Antitrust Compliance Fails To Establish A Credible Basis To Investigate Wrongdoing.

On June 1, 2022, this Court issued a post-trial decision in *Oklahoma Firefighters Pension & Retirement Systems v. Amazon.com, Inc.*, 2022 WL 1760618 (Del. Ch. June 1, 2022).  In *Amazon.com*, an Amazon stockholder sought books and records under Section 220 for the purpose of investigating possible mismanagement by Amazon's directors and officers in connection with the Company's compliance with U.S. antitrust and tax laws.  *Id*. at *1.  The Court denied the inspection request, finding "the evidence of potential malfeasance regarding alleged anticompetitive conduct lack[ed] the sort of 'plus factor' found in . . . [prior] cases where ongoing

---

[18] *Id*.

[19] JX 219 at 59.

[20] *Id*.

[21] *Amazon.com, Inc.*, 2022 WL 1760618, at *5.

5

government investigations and lawsuits contributed to the satisfaction of the credible

basis standard." *Id*. at *8.  Specifically, the Court explained:

> The investigations into Amazon's antitrust compliance have little probative value.  The Congressional Subcommittee investigation closed in 2020 with no finding of an antitrust violation by Amazon.  The DOJ and FTC investigations are evidenced solely by news articles, which report on the existence of the investigations but lack any credible suggestion that Amazon has engaged in wrongdoing.  The recently reported SEC investigation is not evidence supporting an inference of possible misconduct for similar reasons.  The European Commission's investigation concerns whether Amazon breached E.U. competition rules—not the domestic laws that are the express focus of the demand— and no evidence of an adverse outcome was presented.
>
> The additional news articles introduced by the plaintiff do not tip the scales. Many of those articles are stale, having been published years before the plaintiff made its Section 220 demand.  The more recent pieces, such as the April 2020 Wall Street Journal article, are also insufficient.  The demand states that the Wall Street Journal article caused members of Congress to question whether aspects of Amazon's testimony and written responses were false or misleading.  But no evidence was proffered that those purported concerns led to civil or criminal proceedings against Amazon.

*Id*. at *8-9 (footnotes omitted).  The Court concluded that the stockholder plaintiff

failed to present sufficient evidence to show a credible basis from which the Court

could suspect wrongdoing, and therefore lacked a proper purpose for inspection.[22]

*Id*. at *10-11.

---

[22] The Court further concluded that the stockholder plaintiff failed to establish a credible basis to investigate possible mismanagement regarding tax compliance or the

6

## C. Developments Since *Amazon.com*

At trial, the parties identified several developments postdating (or immediately preceding) the Court's June 2022 decision in *Amazon.com*.

On January 26, 2022, Washington's Attorney General filed an eight-page complaint in the King County Superior Court of Washington, alleging that Amazon's "Sold by Amazon" program restrained price competition in violation of the Washington Consumer Protection Act (the "Washington AG Action").[23] The next day, the parties filed a consent decree in which Amazon agreed not to resume that already-discontinued program and to pay $2.25 million to the Washington Attorney General for recovery of its "costs and attorneys' fees" in the investigation.[24] The parties agreed that the consent decree "does not constitute evidence or an admission regarding the existence or non-existence of any issue, fact, or violation of any law alleged by Plaintiff . . . ."[25]

On September 14, 2022, California's Attorney General filed a complaint in California Superior Court, alleging that Amazon engaged in anticompetitive

---

independence and disinterestedness of Amazon's directors. *Id*. at *10. The Court also determined, alternatively, that the stockholder plaintiff was not entitled to further inspection because Amazon had already produced all books and records necessary and essential to satisfy the plaintiff's stated purpose. *Id*. at *12-13.

[23] JX 15 at 1; JX 17 ¶¶ 30-35.

[24] JX 16 ¶¶ 4.1, 7.1.

[25] *Id*. ¶ 1.11.

practices in violation of California unfair competition and antitrust laws (the "California AG Action").[26] In response, Amazon filed a cross-complaint asserting that Amazon's challenged business practices are lawful.[27] On March 30, 2023, the California Superior Court overruled Amazon's demurrer to the complaint,[28] explaining that "[t]he Court [could not] conclude on the face of the Complaint that the challenged agreements are per se illegal under California law,"[29] but "[w]hether Amazon's alleged agreements and conduct have had a substantial anticompetitive effect raises factual questions that cannot be decided on demurrer" and "whether a given practice is anticompetitive (or, as Amazon contends, procompetitive) often does not lend itself to bright-line rules."[30] On October 5, 2023, the California Superior Court largely overruled the California Attorney General's demurrer to Amazon's cross-complaint.[31]

In December 2022, the European Commission announced that its antitrust investigations into Amazon had concluded.[32] To resolve the investigations, Amazon

---

[26] JX 19 ¶¶ 214-22.

[27] JX 226 ¶ 56.

[28] JX 22 at 2; JX 23 at 1.

[29] JX 23 at 10.

[30] *Id*. at 12-13.

[31] JX 227 at 8-11.

[32] JX 20 at 1-2; JX 21 at 1.

agreed to make "changes to its business practices," including restrictions on Amazon's use of private third-party seller data for some purposes and certain prohibitions on discriminatory treatment of third-party sellers.[33] The announcement stated that an independent trustee would monitor Amazon's compliance with the commitments and that the European Commission could impose a fine "[i]f Amazon were to breach the commitments."[34] It also explained that the resolution did "not reach a conclusion as to whether there [wa]s an infringement of EU antitrust rules but legally binds the company to respect the commitments."[35]

On September 26, 2023, the FTC, joined by seventeen states' attorneys general, sued Amazon in the U.S. District Court for the Western District of Washington (the "FTC Action").[36] The 153-page complaint in that action (the "FTC Complaint") alleges that Amazon acted unlawfully by using "anti-discounting tactics to prevent rivals from growing by offering lower prices" and "coercive tactics involving its order fulfillment service to prevent rivals from gaining the scale they need to meaningfully compete."[37] In December 2023, Amazon moved to dismiss

---

[33] JX 20 at 3-4.

[34] *Id*. at 4.

[35] *Id*. at 5.

[36] JX 39; JX 57 [hereinafter, "FTC Compl."].

[37] JX 39 ¶ 7.

the FTC Complaint.[38] On March 14, 2024—three months after this action was filed—the FTC filed an amended complaint.[39] Trial is scheduled for October 2026.[40]

The FTC Action garnered significant media coverage.[41] It also "spawned"[42] three additional lawsuits. Namely, on October 3, 2023, a proposed class action was filed against Amazon in the U.S. District Court for the Western District of Washington on behalf of individuals or organizations in a "Bundling Subclass" and a "Retail E-Commerce Subclass," who allegedly paid "artificially high prices."[43] On December 11, 2023, online retailer Zulily, LLC sued Amazon in the U.S. District Court for the Western District of Washington, identifying the FTC Action as the basis for its claims.[44] And on February 8, 2024, a proposed class action was filed

---

[38] JX 63.

[39] JX 113.

[40] JX 112 at 30.

[41] *See, e.g.*, JX 30-38, 41-43.

[42] *See* POB at 11 (asserting that the FTC Complaint "spawned additional lawsuits against Amazon relating to the same conduct, and with the FTC Action's well-researched allegations as support").

[43] JX 48 ¶¶ 5, 8, 59, 65.

[44] JX 64 at 1-3 (citing FTC Compl. ¶¶ 269, 276, 343, 345, 350); *see also id*. ¶¶ 16, 30, 47, 49-50, 53, 59-60, 80, 100, 105, 119, 125-27, 142, 146 (citing FTC Compl. ¶¶ 117-83, 263, 323, 344-46).

against Amazon in the U.S. District Court for the Western District of Washington, also referencing the FTC Action.[45]

### D. The Demand

On October 24, 2023, Roberta Ann K.W. Wong Leung Revocable Trust U/A Dated 03/09/2018 ("Plaintiff"), an Amazon stockholder, sent the Company a letter demanding to inspect its books and records under 8 *Del. C.* § 220 (the "Demand").[46] The Demand explains that Plaintiff's purpose for inspection is "to investigate potential corporate mismanagement, wrongdoing, and waste by fiduciaries of the Company . . . ."[47] As the basis for inspection, the Demand explains that Plaintiff is "concerned that Amazon's fiduciaries have authorized or allowed the Company [to] take unlawful advantage of [its] dominant position to engage in anticompetitive practices, leading to U.S. and international regulatory scrutiny, lawsuits, and fines."[48] In a section titled "Amazon's History of Monopolistic Behavior," the Demand describes the European Commission's investigations, the Congressional Subcommittee's investigation, the Washington AG Action, and the California AG

---

[45] JX 84 ¶¶ 4, 20, 29, 31, 36, 41, 44, 50 (citing FTC Compl. ¶¶ 11, 16, 67, 80-81, 85, 89, 112, 122).

[46] JX 53.

[47] *Id*. at 1.

[48] *Id*.

Action.[49] In addition, the Demand devotes eleven pages to summarizing the FTC Complaint, though it was "heavily redacted" at the time of the Demand.[50] The Demand also identifies the ICA Fine levied in December 2021 as a "recent development."[51]

On November 14, 2023, Amazon responded to the Demand, asserting that the Demand failed to state a proper purpose and was overbroad in scope, but nevertheless offering to produce "a targeted set of materials" with the caveat that "[a]ny such production would be conditioned on the prior execution of a suitable confidentiality agreement."[52] Thereafter, Amazon proposed a confidentiality agreement that imposed, among other conditions, a jurisdictional restriction limiting use of the inspection materials in litigation to a Delaware forum.[53]

Plaintiff refused to agree to a Delaware forum provision. Instead, on December 14, 2023, Plaintiff initiated this action through the filing of a Verified Complaint for Relief Pursuant to 8 Delaware Code Section 220 to Compel Inspection of Books and Records (the "Complaint").[54]

---

[49] *Id*. at 2-7.

[50] *Id*. at 7-18

[51] *Id*. at 7-11.

[52] JX 60 at 2-3.

[53] JX 49 ¶ 14.

[54] Dkt. 1; JX 68.

The parties filed pre-trial opening briefs on March 19, 2024[55] and pre-trial answering briefs on April 16, 2024.[56] The Court held a one-day trial on a paper record on April 26, 2024.[57]

## II. ANALYSIS

### A. Legal Standard

"To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection." *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020). "If a stockholder meets these requirements, the stockholder must then establish 'that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose.'" *Id.* (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)). If an inspection is ordered, "the Court of Chancery has wide discretion to shape the breadth and use of inspections under § 220 to protect the legitimate

---

[55] Def. Amazon.com, Inc.'s Op. Pre-Trial Br., Dkt. 39; POB, Dkt. 40.

[56] Def. Amazon.com, Inc.'s Ans. Pre-Trial Br., Dkt. 46; Pl.'s Ans. Pre-Trial Br. [hereinafter, "PAB"], Dkt. 47.

[57] Dkt. 56.

interests of Delaware corporations." *United Techs. Corp. v. Treppel*, 109 A.3d 553, 559 (Del. 2014).

Amazon does not contest that Plaintiff is a stockholder and that the Demand satisfies the form and manner requirements of Section 220. The parties do, however, dispute whether Plaintiff has demonstrated a proper purpose to inspect books and records, scope, and the conditions on any inspection, including whether a confidentiality order should include a Delaware forum provision.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). Here, Plaintiff seeks to investigate possible corporate mismanagement, wrongdoing, and waste, citing concerns that Amazon fiduciaries have authorized or allowed the Company to engage in anticompetitive practices in violation of domestic and foreign antitrust laws.

Under Delaware law, a stockholder's desire to investigate wrongdoing is a proper purpose. However, "[a] mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle a shareholder to broad § 220 inspection relief." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006) (internal quotation marks omitted) (quoting *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del.Ch.1987)). To establish a proper

14

purpose of investigating wrongdoing, a stockholder "'must present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred.'" *Pettry*, 2020 WL 6870461, at \*10 (ellipses in original) (quoting *Seinfeld*, 909 A.2d at 118). "Although not an insubstantial threshold, the credible basis standard is the 'lowest possible burden of proof.'" *AmerisourceBergen Corp. v. Lebanon Cty. Emps.' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020) (quoting *Seinfeld*, 909 A.2d at 123). "A stockholder need not show that corporate wrongdoing or mismanagement has occurred in fact, but rather the 'threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'" *Id*. (citation omitted).

In this case, the evidence presented "primarily concerns certain government investigations and litigation." *Amazon.com, Inc*., 2022 WL 1760618, at \*6. "Ongoing investigations and lawsuits *can* provide the necessary evidentiary basis to suspect wrongdoing or mismanagement warranting further investigation." *Id*. (emphasis added) (quoting *Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen*, 2020 WL 132752, at \*9 (Del. Ch.), *aff'd*, 243 A.3d 417 (Del. 2020)). But "Delaware law does not . . . provide that evidence of open inquiries and lawsuits alone necessarily begets a credible basis from which the court can infer possible mismanagement." *Id.* at \*6. "If every government inquiry or lawsuit was sufficient evidence to satisfy the credible basis test, stockholders would effectively be relieved

15

of their burden of 'show[ing] some evidence of possible wrongdoing.'" *Id.* at *7 (alteration in original) (first citing *La. Mun. Police Emps.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *3 (Del. Ch. Oct. 5, 2012); then citing *Seinfeld*, 909 A.2d at 122). Instead, "Delaware courts have routinely looked to some additional evidence beyond ongoing inquiries or litigation to find that a plaintiff has met its burden." *Id.*; *see also id.* n.66 (collecting cases). In some cases, "the scale of investigations and lawsuits, the severity or results of those inquiries, and corporate trauma" have provided the additional evidence needed to establish a credible basis. *Id.*

### B. Plaintiff Has Failed To Meet Its Burden To Demonstrate A Credible Basis To Investigate Wrongdoing.

This Court previously determined that government investigations, news articles, and lawsuits predating June 2022 did not provide a credible basis to investigate wrongdoing concerning Amazon's antitrust compliance. *Amazon.com, Inc.*, 2022 WL 1760618, at *8-10. I consider here whether more recent factual developments change that analysis, or if the evidence of possible wrongdoing still falls short.

Plaintiff contends that "the 'plus factor'" missing in *Amazon.com* is now "more than established" with the filing of the FTC Complaint.[58] According to Plaintiff, the "thoroughness" and "detail" of that pleading, which resulted from "a

---

[58] POB at 31.

16

massive, years-long investigation that included the review of millions of internal Amazon documents and dozens of interviews with Amazon executives,"[59] alone should satisfy the credible basis standard.[60] As support, Plaintiff relies on two cases—*In re UnitedHealth Group, Inc. Section 220 Litigation*[61] and *Pettry v. Gilead Sciences, Inc.*[62]—where the Court found that detailed government complaints supported by additional evidence provided a credible basis to investigate wrongdoing.[63] But neither case supports the proposition that allegations alone will satisfy the credible basis standard.

In *UnitedHealth Group*, the Court found a credible basis to suspect wrongdoing based on a qui tam complaint that "cited and attached" "an extensive factual record" from a five-year DOJ investigation that "include[d] references to, and quotations from, the Company's internal emails, letters, audit reports, charts, attestations, policies, presentation materials, and memoranda." *In re UnitedHealth*, 2018 WL 1110849, at *3, *7; *see also id*. at *3-5 (summarizing in twenty-eight

---

[59] *Id*. at 12.

[60] *Id*. at 31; *see also id*. at 34 ("The FTC Action would be sufficient alone . . . .").

[61] 2018 WL 1110849 (Del. Ch.), *aff'd sub nom. UnitedHealth Gp. Inc. v. Amalgamated Bank as Tr. for Longview Largecap 500 Index Fund*, 196 A.3d 885, 2018 WL 5309957 (Del. 2018) (TABLE).

[62] 2020 WL 6870461.

[63] POB at 28-30.

detailed bullets the extensive evidence cited in and attached to the quit tam complaint).  With that additional evidence, "even if [the] complaint alone [were] insufficient, Defendant [could not] escape the testimony and documents that demonstrate a credible basis for this Court to infer possible wrongdoing or mismanagement simply because they [we]re referenced in a complaint."  *Id*. at *7.  Similarly, in *Gilead*, the Court did not rely exclusively on the "thoroughness" of an astounding 1,739-page DOJ complaint to support investigation into wrongdoing concerning patent infringement, but also on the ninety-two exhibits attached to that pleading, as well as a ruling from the Patent Trial and Appeals Board concluding that the company "ha[d] not demonstrated a reasonable likelihood of prevailing" on its patent claims.  *Pettry*, 2020 WL 6870461, at *14 (citation and internal quotation marks omitted).[64]

The trouble with Plaintiff's position here is that the FTC Complaint pleads allegations, not evidence.  Unlike the government complaints in *UnitedHealth Group* and *Gilead*, the FTC Complaint does not extensively quote testimony or

[64] *See Pettry*, 2020 WL 6870461, at *14 (explaining that "[t]he thoroughness of the U.S. government's complaint *and* the Patent Trial and Appeals Board's ruling" established a credible basis to suspect possible wrongdoing (emphasis added)).  *See also, e.g.*, *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151, at *6 (Del. Ch. May 31, 2017) (finding pleadings in a lawsuit "coupled with" apparently false public statements made by the company's management satisfied the credible basis standard), *abrogated on other by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

attach the documents on which it relies, so the Court cannot evaluate the underlying evidence "to determine if there exists an inference of wrongdoing." *UnitedHealth*, 2018 WL 1110849, at \*7 n.92. The allegations in the FTC Complaint could be sufficient, if supported by additional evidence, but they alone do not satisfy the credible basis standard.

Unfortunately for Plaintiff, the other "evidence" it identifies—more lawsuits and investigations—does not provide that necessary additional support.[65] Plaintiff identifies two lawsuits filed by state attorneys general. The Washington AG Action was filed with a consent decree in which Amazon did not admit "liability or any wrongdoing" and agreed to pay a relatively small amount to defray the cost of the Washington Attorney General's investigation.[66] The California AG Action likewise has not, at least in its early stages, resulted in any adverse outcome for Amazon. Notably, although the California Superior Court denied Amazon's demurrer to the complaint, it also denied the California Attorney General's demurrer to Amazon's

---

[65] *See* POB at 31 ("Plaintiff's credible basis showing extends to other government investigations, lawsuits, fines, media coverage, and other lawsuits, in addition to the FTC Action.").

[66] JX 16 ¶¶ 4.1, 7.1.

cross-complaint asserting that the challenged business practices are lawful. Neither lawsuit tips the credible basis analysis.[67]

Plaintiff also points to the European Commission's antitrust investigations into Amazon and the ICA Fine.[68] The European Commission's investigations do not provide a basis to suspect possible wrongdoing.[69] While Amazon agreed as part of the investigations to make changes to certain business practices, the European Commission ultimately did not find that Amazon violated the law, nor did it impose a fine.[70] Though Plaintiff points out that violating an agreement with the European Commission could have severe consequences, it has offered no basis to suspect that

---

[67] Plaintiff also identifies three other lawsuits filed against Amazon in the U.S. District Court for the Western District of Washington, but as Plaintiff concedes, those complaints merely "cite[] and rel[y] upon" the FTC Complaint, so they add little to the analysis. POB at 19; *see also* nn.43-45, *supra*. The same is true of media coverage reporting on the FTC Action. *See, e.g.*, JX 30-38, 41-43.

[68] Notably, while the Demand purports to seek to investigate possible wrongdoing concerning compliance with domestic *and* foreign antitrust laws, Plaintiff's briefing confirms that the "crux" of its purpose is "to investigate whether Amazon's Board or executives mismanaged the Company and/or breached their fiduciary duties to Amazon and its stockholders in connection with Amazon's failure to comply with *state and federal* antitrust laws." POB at 37 (emphasis added) (citing JX 54); *see also* PAB at 6-7 (explaining that the European Commission's investigations and the ICA Fine "evidence[] the antitrust concerns at the heart of Plaintiff's Demand" because they "relate to many of the same specific concerns identified in the FTC Action").

[69] JX 20 at 1-5; JX 21.

[70] JX at 4; JX 21 at 3. Plaintiff asserts that "the EC made preliminary conclusions that Amazon was violating EU antitrust laws," PAB at 11, but does not dispute that the European Commission ultimately did "not reach a conclusion as to whether there [wa]s an infringement of EU antitrust rules." JX 21 at 5.

Amazon might do so.[71] The ICA Fine perhaps presents a closer call. As the Court acknowledged in *Amazon.com*, the ICA is "not insubstantial" and "comes closest to the sort of evidence that our court has found supportive of an inference of possible wrongdoing . . . ." *Amazon.com, Inc.*, 2022 WL 1760618, at \*9. But the ICA Fine is still under appeal, and aside from its size—large, but only approximately 0.2 percent of Amazon's 2023 revenues—the trial record contains virtually no details about the fine or the decision on which it was based.[72]

Viewing the evidence in the aggregate, Plaintiff falls short of establishing a credible basis to investigate wrongdoing. The evidence presented here is a far cry from the cases on which Plaintiff relies—*Lebanon County Employees' Retirement Fund v. AmerisourceBergen Corp.*,[73] *Gilead*,[74] and *In re Facebook, Inc. Section 220 Litigation*[75]—where "the scale of investigations and lawsuits, the severity or results of those inquiries, and corporate trauma provided the necessary indication of

---

[71] *See* PAB at 11.

[72] *See* JX 21 at 2 (reporting that "[i]n Italy, Amazon has agreed to 'separate leagle remedies' with the country's competition regulator relating to the Buy Box and Prime"); JX 24 at 14 ("In December 2021, the [ICA] issued a decision against Amazon Services Europe S.à r.l., Amazon Europe Core S.à r.l., Amazon EU S.à r.l., Amazon Italia Services S.r.l., and Amazon Italia Logistica S.r.l. claiming that certain of our marketplace and logistics practices in Italy infringe EU competition rules.").

[73] 2020 WL 132752.

[74] 2020 WL 6870461.

[75] 2019 WL 2320842 (Del. Ch. May 30, 2019).

21

potential wrongdoing to support stockholders' parallel books and records investigations." *Amazon.com, Inc.*, 2022 WL 1760618, at *7.

In *AmerisourceBergen*,[76] a stockholder plaintiff identified multiple federal investigations and over forty investigations by state attorneys general (including completed government investigations that found "widespread violations"[77]), plus more than 1,500 civil lawsuits, resulting in "significant corporate trauma." *AmerisourceBergen*, 2020 WL 132752, at *11. In *Gilead*,[78] the alleged wrongdoing "appear[ed] vast" based on evidence of multiple ongoing government investigations,

---

[76] In *AmerisourceBergen*, stockholder plaintiffs sought to investigate whether fiduciaries of one of the world's largest wholesale distributors of opioid pain medication engaged in wrongdoing in connection with the distribution of opioids. *AmerisourceBergen*, 2020 WL 132752, at *1. Noting that "[t]he opioid crisis is a matter of national significance," the Court found "strong circumstantial evidence" indicating AmerisourceBergen "may have ignored indications of suspicious orders, failed to halt and investigate suspicious orders, and failed to report suspicious orders to the DEA," "may have ignored indications that it was distributing opioids to rogue pharmacies and that it chose to continue doing business with these pharmacies rather than cutting them off," and "may have pushed opioids into the distribution chain under circumstances where AmerisourceBergen knew or should have known that they would be diverted for improper uses." *Id.* at *11. That evidence provided "a credible basis to suspect that AmerisourceBergen's situation did not result from an ordinary business decision that, in hindsight, simply turned out poorly." *Id.*

[77] *Amazon.com, Inc.*, 2022 WL 1760618, at *8.

[78] In *Gilead*, stockholder plaintiffs sought to investigate possible wrongdoing in connection with Gilead Sciences, Inc.'s development, marketing, and sale of HIV drugs. *Pettry*, 2020 WL 6870461, at *1. The Court found that the plaintiffs "demonstrate[d] a credible basis to suspect wrongdoing at the level of the board or senior management" because "vast evidence" showed "the board and senior management knew about the possible wrongdoing" or "failed to monitor a business segment that was 'mission critical,' as well as vitally important to the lives of millions of people." *Id.* at *15 (quoting *Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019)).

22

a pending government lawsuit, and hundreds of civil actions, including one brought on behalf of more than 15,000 plaintiffs. *Pettry*, 2020 WL 6870461, at *24. And in *Facebook*,[79] the plaintiff identified "dozens" of pending lawsuits and numerous open regulatory inquiries, including, most saliently, a U.K. House of Commons report that, "after summarizing emails, meeting minutes, witness interviews and other evidence," concluded that Facebook had "intentionally and knowingly" violated data privacy and competition laws. *In re Facebook*, 2019 WL 2320842, at *9, *13.

By contrast, here, Plaintiff has identified not thousands, but a handful, of lawsuits, many of which merely repeat the allegations of the FTC Complaint. Government investigations have closed without ultimately finding any, let alone "widespread" or "intentional[] and knowing[,]" violations of law. And Amazon has

---

[79] In *Facebook*, stockholder plaintiffs sought to investigate possible wrongdoing concerning compliance with a consent decree entered by the FTC after it determined that the company's data privacy measures were not protecting users' private information. *Facebook*, 2019 WL 2320842, at *1. The U.K. House of Commons report on which the Court relied found the "Cambridge Analytica Scandal was facilitated by Facebook's policies and . . . display[ed] the fundamental weakness of Facebook in managing its responsibilities to the people whose data is used for its own Commercial purposes," "[i]f [Facebook] had fully complied with the [consent decree], [the Cambridge Analytica scandal] . . . would not have happened," and Facebook's board was aware of data privacy breaches but attempted "to deflect attention" from these breaches to "avoid scrutiny." *Id.* at *13 (alterations and ellipses in original) (citations, footnotes, and internal quotation marks omitted). The report provided "evidence the Board knew of the Company's obligations to implement data security measures, knew the Company had not implemented or maintained those measures as required by the Consent Decree and, nevertheless, condoned the Company's monetization of its users' private data in violation of the Consent Decree." *Id.* at *14.

23

paid relatively minor amounts, but has not suffered "significant corporate trauma."[80] Because the evidence, in the aggregate, does not satisfy Plaintiff's burden to demonstrate a credible basis to investigate possible wrongdoing concerning Amazon's compliance with antitrust laws, Plaintiff's inspection request must be denied.

*　　　　*　　　　*

In *Amazon.com*, Amazon "took the lessons of our case law to heart" and "attempted to avoid litigation by producing the core, formal board materials that generally satisfy a company's obligations under Section 220." *Amazon.com, Inc.*, 2022 WL 1760618, at *11. In briefing and at trial, Plaintiff lamented that Amazon took a different approach here, but that is not entirely true. Amazon offered to produce documents in response to the Demand, subject to a confidentiality agreement; Plaintiff opted to litigate provisions in that proposed agreement. Because Plaintiff has not demonstrated a proper purpose for inspection, I cannot opine on those conditions. The result is uncomfortable, but it is the risk Plaintiff assumed.[81]

---

[80] Plaintiff argues that "the severity of the FTC Action is reflected by the fact that it includes twenty counts[,]" is supported by nineteen state attorneys general, has been "cited and relied upon" in three other lawsuits, and has been extensively covered by media outlets. PAB at 11-12. This does not amount to "significant corporate trauma."

[81] In briefing and at trial, Plaintiff hinted that Amazon's failure to produce formal board materials warrants fee shifting. *See* POB at 3 n.4 (first citing *Pettry*, 2020 WL 6870461,

24

## III. CONCLUSION

For the reasons explained above, I recommend that judgment be entered for Amazon. The stay of exceptions under the Chancellor's assignment letter is hereby lifted. Under Court of Chancery Rule 144(d)(2), the parties may file exceptions within three business days.

---

at *30; then citing *Myers v. Acad. Sec., Inc.*, 2023 WL 4782948, at *16 (Del. Ch.), *R. & R. adopted*, 2023 WL 6380449 (Del. Ch. 2023)); *see also* PAB at 3 n.4 (same). To warrant fee shifting under the bad faith exception to the American Rule, a litigant's conduct must be "glaring[ly] egregious[]." *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023) (citation and internal quotation marks omitted). Amazon's request for a Delaware forum provision—when it has received multiple demands from stockholders seeking to investigate similar issues with a likely outcome of filing derivative claims governed by Delaware law—does not approach bad faith. Indeed, when a company voluntarily agrees to produce formal board materials, as Amazon did here, it is hard to conceive how fee shifting could be appropriate, absent egregious litigation misconduct.